1  KAREN A. OVERSTREET
   Chief Bankruptcy Judge
2  United States Courthouse
   700 Stewart St., Suite 6310
3  Seattle, WA  98101
   206-370-5330
4

5              UNITED STATES BANKRUPTCY COURT
              WESTERN DISTRICT OF WASHINGTON
6                     AT SEATTLE

7  In re                          )
                                  )    Chapter 7
8  LISA SCHMIDT-HENDERSON and     )
   DARRIN HENDERSON,              )
9                                 )
              Debtors.            )
10                                )    Bankruptcy No. 09-15664
                                  )
11 _____)
                                  )
12 SOUND BILLING SERVICES, INC., )      Adversary No. 09-01327
   a Washington Corporation,      )
13                                )
              Plaintiff.          )
14                                )
   v.                             )    **MEMORANDUM DECISION**
15                                )
   LISA SCHMIDT-HENDERSON and     )
16 DARRIN HENDERSON, individually)     **NOT FOR PUBLICATION**
   and on behalf of the marital   )
17 community; LIBERTY BILLING,    )
   LLC, a Washington Limited      )
18 Liability Company,             )
                                  )
19            Defendants.         )
   _____)
20

21      This matter came before the Court for trial on May 13, 2010,

22 May 20, 2010, and July 15, 2010.  Plaintiff was represented by

23 William A. Olson of Aiken, St. Louis & Siljeg, P.S., Seattle,

24 Washington and the defendants were represented by David B. Adler,

25 Seattle Washington.  The Court, having considered the evidence,

26 including the testimony of witnesses and the documents and exhibits

27 which were admitted into evidence, issues this Memorandum Decision

28 as its findings of fact and conclusions of law for purposes of


MEMORANDUM DECISION - 1

Bankruptcy Rule 7052. The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding under 28 U.S.C. § 157(b)(2)(C) and (I).[1]

For the following reasons, I find that (i) SBS is entitled to an order requiring Ms. Schmidt and Liberty Billing, LLC ("Liberty") to return to SBS certain confidential information in their possession as described in more detail below; (ii) the obligation of Ms. Schmidt to return confidential information is not dischargeable; and (iii) Ms. Schmidt is entitled to judgment against SBS in the amount of $10,000 for unpaid compensation.

## I. BACKGROUND

The parties bring various claims against each other arising out of a Subcontractor Agreement entered into between Sound Billing Services, Inc. ("SBS") and Lisa Schmidt-Henderson (Ms. Schmidt) in 1999 (the "Subcontractor Agreement"). Under that agreement, Ms. Schmidt provided medical billing services to customers of SBS. Plaintiff's causes of action in the complaint include (1) breach of contract, including misuse of confidential information, unlawful competition, and unsatisfactory performance under the contract; (2) misappropriation of trade secrets within the meaning of RCW 19.108.010(2) and violation of the Uniform Trade Secrets Act, RCW 19.108; (3) common law conversion of the plaintiff's confidential information; (4) tortious interference with contractual relations and business expectations; (5) objection to discharge on two bases,

---

[1] Unless otherwise indicated, all Code, Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. §§101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

MEMORANDUM DECISION - 2

that injunctive relief necessary to stop a violation of the Subcontractor Agreement is not a "claim" under Bankruptcy Code § 101(12) and is therefore non dischargeable, and that the claim of SBS is nondischargeable under § 523(a)(6) for willful and malicious injury. Plaintiff's reply brief makes it clear that the action is against Ms. Schmidt personally and her marital community, but is not an action against Mr. Henderson personally.

In her initial answer, Ms. Schmidt asserted a counterclaim against SBS for breach of contract in failing to pay her for services performed from December 2008 through February 9, 2009, and a counterclaim for negligent infliction of emotional distress. Liberty also asserted a counterclaim against SBS for unlawful interference with its business operations. Six calendar days before the trial date, defendants filed a motion seeking authority to amend the complaint to assert certain additional defenses, and to add two additional counterclaims, a claim to pierce the corporate veil of SBS and impose liability on Lynn Hatter, its president and sole shareholder, and a counterclaim against Ms. Hatter and SBS for violation of RCW 49.46.010(2) and 49.48.010 (unlawful refusal to pay wages). On the first day of trial, I denied defendants' request as to the additional counterclaims but granted the request as to the additional defenses. My oral ruling on that motion is incorporated herein by this reference.

In pretrial proceedings, I granted the defendants' motion to dismiss plaintiff's claim that Ms. Schmidt had violated the noncompete provision of the Subcontractor Agreement because I held that the noncompete provision contained in that agreement expired by its own terms on April 21, 2002, two years after the expiration

MEMORANDUM DECISION - 3

of the Subcontractor Agreement on April 21, 2000.  I also granted
the defendants' motion to dismiss the Section 727 objection to
discharge claim as to any claim based upon a violation of the
noncompete provision.  I denied the balance of the defendants'
motion to dismiss leaving the following claims of plaintiff for
trial: (i) defendants' breach of contract by misuse of confidential
information and unsatisfactory performance under the contract; (ii)
defendants' Misappropriation of trade secrets within the meaning of
RCW 19.108.010(2) and violation of the Uniform Trade Secrets Act,
RCW 19.108; (iii) defendants' common law conversion of the
plaintiff's confidential information; (iv) defendants' tortious
interference with contractual relations and business expectations;
(v) objection to defendant Schmidt and Henderson's discharge on the
ground that injunctive relief necessary to stop a violation of the
contract (Ms. Schmidt's use of Confidential Information) is not a
"claim" under Bankruptcy Code § 101(12) and is therefore non
dischargeable; (vi) objection to the debtors' discharge under
523(a)(6) for willful and malicious injury.  The following claims
of defendants were also left for trial: (i) Ms. Schmidt's claim for
breach of contract for failure to pay her amounts due for work
performed from December 2008 through February 9, 2009; (ii)
Ms. Schmidt's counterclaim for negligent infliction of emotional
distress; and (iii) the claim by Liberty against SBS for wrongful
interference in Liberty's business.

MEMORANDUM DECISION - 4

## II. FINDINGS OF FACT[2]

SBS is a corporation formed in 1995 to provide medical billing services primarily to mental health practitioners. The business was formed while Ms. Lynn Hatter, the current president and sole owner of SBS, was also the office manager for doctors Lindsay, Roark, Graham, Sonnanburg, and McClung ("Lindsay Roark"). Ex. P-2. In 1997, Ms. Hatter left Lindsay Roark to run SBS full time after acquiring 100% of the stock of SBS. Ex. P-3, P-4. Ms. Schmidt replaced Ms. Hatter as Lindsay Roark's office manager.

SBS had approximately 20 clients in 1997, which grew to a total of 68 clients by the end of January 2009. SBS' business is tailored to health care providers in the mental health field and its working files include data on client demographics, fee schedules for patient services, third party payor lists, insurance claim information, patient lists and demographics, diagnostic history, charge and payment information, patient balances and records and notes of SBS contacts with the client and patients regarding billing matters ("SBS Working Files").

SBS hired independent contractors to conduct billing for some of its clients. SBS hired defendant Lisa Schmidt in April 1999 as an independent contractor to perform billing services pursuant to the terms of the Subcontractor Agreement. Paragraph 7 of the Subcontractor Agreement provides as follows:

> <u>Confidentiality</u> Contractor shall maintain in strict confidence and not disclose to any third party, except in compliance with this Agreement or as otherwise may be required by law, and all documents, data, and information in any form or

---

[2] The admitted facts in the parties' pretrial order at Docket No. 62 are incorporated herein by this reference.

MEMORANDUM DECISION - 5

of any nature received or produced by or
        delivered to it in conjunction with its
        performance hereunder (collectively referred to
        as "confidential information").  All
        confidential information is the property of SBS
        and shall be returned/delivered to SBS upon
        termination of this Agreement.  Contractor
        recognizes and acknowledges that the
        confidential information constitutes a
        valuable, special, and unique asset of SBS and
        is otherwise protected by privileges.
        Contractor shall not disclose nor permit any
        third person to use, examine, or make copies of
        any confidential information or any information
        derived from confidential information whether
        prepared by contractor, SBS, or otherwise,
        which may come within the contractor's
        possession or control.

Ms. Schmidt also signed a Privacy Agreement with SBS which required her to return or destroy all Protected Health Information, as defined in that agreement, upon termination for any reason.  Ex. P-6, ¶ 3.3(a).  "Confidential Information," as defined in the Subcontractor Agreement and "Protected Health Information," as defined in the Privacy Agreement, are referred to hereinafter collectively as the "Protected Information."

The Subcontractor Agreement also contained a noncompete provision which prohibited Ms. Schmidt from directly or indirectly engaging in any business which competes with any aspect of the business of SBS and from having any business dealings or contact with any customer or client of SBS for 24 months after "termination of this agreement for any reason."  Ex. P-5, ¶ 8.  The noncompete provision expired on April 21, 2002, two years after the expiration of the Agreement on April 21, 2000.  The parties tried, but were unable to negotiate an extension of the Subcontractor Agreement and instead continued their business arrangement without change until the end of 2008.

MEMORANDUM DECISION - 6

Toward the end of 2008, the parties otherwise productive and cordial relationship deteriorated.  Ms. Hatter was anxious for Ms. Schmidt to renew her formal contractual relationship with SBS and Ms. Schmidt was reluctant to agree to a new noncompete provision.  Ms. Hatter raised concerns about Ms. Schmidt's work performance, and Ms. Schmidt disputed any performance problems. The relationship finally fell apart at a meeting between Ms. Hatter and Ms. Schmidt on January 29, 2009.  At the meeting, Ms. Hatter demanded that Ms. Schmidt enter into a new contract with SBS and, as a condition to the new contract, Ms. Schmidt would be put on a 90-day probation period during which Ms. Hatter would be assessing her work performance.  Ms. Schmidt was not willing to agree to a probationary period or to a new contract and wanted an opportunity to consult with a lawyer.  At the conclusion of the meeting, Ms. Hatter gave Ms. Schmidt a letter which stated that Ms. Schmidt's contract with SBS would be terminated effective 60 days from January 29, 2009.  Ex. P-11.

The next day, after discussions between Ms. Hatter and Ms. Schmidt's husband, Darrin Henderson, Ms. Hatter sent an email to Ms. Schmidt stating that notwithstanding the termination letter, she was willing to renew the contract "contingent of (sic) the same terms we discussed" at the previous days' meeting, and she asked Ms. Schmidt to let her know if she was agreeable to that by Monday, February 2, 2009.  Ex. D-12.  An email on February 3, 2009, Ex. D-13, indicates that the parties were still negotiating the terms of a new agreement as of that date. By February 9, 2009, however, neither party had contacted the other.  Ms. Hatter became concerned that Ms. Schmidt was no longer processing claims for SBS clients

MEMORANDUM DECISION - 7

because Ms. Schmidt did not appear to have uploaded any insurance claims from January 31, 2008 to February 8, 2009, and because Ms. Schmidt had not sent SBS her January month end reports. Ms. Schmidt testified that due to the stress of the situation, she was not able to work between January 30 and February 6, and during that time she did not upload any insurance claims. The evidence showed, however, that Ms. Schmidt completed the upload of insurance claims for that period on February 6, 7 and 8. Ex. D-32, Ex. D-73.

On February 9, 2009, Ms. Hatter faxed Ms. Schmidt Exhibit P-13, a letter expressing her concerns about whether Ms. Schmidt was going to continue to perform her services for SBS. The same day, Ms. Schmidt's attorney, Matthew O'Conner, delivered a letter to Ms. Hatter which advised that Ms. Schmidt had rejected the proposed new subcontractor agreement and that Ms. Hatter should no longer communicate directly with Ms. Schmidt. The letter did not state one way or anther whether Ms. Schmidt was continuing to work for SBS, however, the first sentence of the letter implies that Mr. O'Connor was proceeding on the assumption that their agreement had been terminated on January 29, 2009. The night of February 9, Ms. Hatter sent out an email to all of Ms. Schmidt's customers advising them not to send any billing information to Ms. Schmidt with no explanation for this direction. Ex. P-37.[3] Ms. Schmidt sent an email to the same customers the next day, February 10, 2009, advising them that effective immediately, she was no longer

---

[3] Although Ex. P-37 is dated January 9, 2009, Ms. Hatter testified the email should have been dated February 9, 2009.

MEMORANDUM DECISION - 8

affiliated with SBS and would not be handling their accounts.  Ex.
D-14.  After February 9, Ms. Schmidt did no further work for SBS.

Exhibit P-13, SBS' letter dated February 9, 2009, requested
that Ms. Schmidt provide month end reports, and make available to
SBS all data pertaining to SBS's clients, including the
Confidential Information.  The letter further instructed
Ms. Schmidt to return "a current backup for all clients currently
in your [Ms. Schmidt's] possession" on two USB data disks which
Ms. Hatter separately mailed to Ms. Schmidt.  The letter also
requested the immediate transfer of "copies of all data" in
Ms. Schmidt's possession so that SBS could provide continuing
service to the customers Ms. Schmidt had been servicing.

In response to the letter, Ms. Schmidt assembled all of the
written documentation and information in her possession, which
included 30 boxes at her home and 108-110 boxes in a separate
storage facility.  She notified SBS that the boxes at her home
would be ready for pick up on February 12, 2009.  Ms. Hatter did
not arrange to pickup those boxes, however, until February 17,
2009.  Ms. Schmidt testified that in one of the boxes at her home,
clearly marked, were the files necessary to complete any unfinished
billing for her SBS clients.  Ms. Schmidt made a copy of all of the
SBS Working Files on her computer on the two data disks provided to
her and returned the disks to SBS by February 12, 2009.  According
to the testimony of Ms. Schmidt, she and Ms. Hatter made plans to
meet at the storage unit to transfer control on March 18, 2009, but
on March 13, 2009, SBS took control of the storage unit by placing
its own lock on the unit.

MEMORANDUM DECISION - 9

Following Ms. Schmidt's notice to her customers that she was no longer associated with SBS, a number of Ms. Schmidt's former SBS customers, some of whom testified at trial, contacted her to see if she would be willing to continue doing their billing work.[4]  After considering this option, Ms. Schmidt decided to form her own billing company and formed Liberty on February 19, 2009.  Ex. D-3. In addition, on the advice of her lawyer that she was not bound by any noncompete agreement with SBS, Ms. Schmidt sent a standard form letter announcing her business in a mass mailing to mental health physicians and service providers, including her former SBS clients. Ex. D-10, Ex. P-14.  She obtained the addressees for her mass mailings from public sources.  Exs. D-6, D-7, D-8, D-9.  As of the time of trial, 17 former SBS customers (the "SBS Former Clients"), listed in Ex. D-72, were under contract with Liberty as their billing company.  Ex. D-2 (Billing Agreements).  These clients terminated their business with SBS between February 25, 2009 and August 10, 2009.  Exs. D-41-D59; D-72.

SBS continued billing services for the remaining 28 clients formerly handled by Ms. Schmidt.  Tamera Huffman, a biller with SBS, took over the billing for 12 of Ms. Schmidt's former clients. Ms. Hatter testified that it took many additional hours of her time as well as the work of Ms. Huffman, to put the files for the 28 customers back in order so that the billing work for them could continue.  Ms. Hatter testified that a number of these customers complained about the disruption to their business, including Dr. Alan Weisser, who testified at trial.  It was clear from the

---

[4]  *See* testimony of Jaqueline Ball, James Roark, Bonita Cantu, Linda Ayers.

MEMORANDUM DECISION - 10

testimony of the physicians and nurses who testified at trial for both plaintiff and defendants that competent and timely billing for patient services is critical to maintaining a steady stream of revenue for these professionals, especially those in solo practice or small offices.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court makes the following conclusions of law.

**A. Common Law Duty of Loyalty and Contractual Duty as to Confidential Information.**

The Subcontractor Agreement required Ms. Schmidt to return all Confidential Information to SBS at the termination of her relationship with SBS. The Privacy Agreement required Ms. Schmidt to return or destroy all Protected Health Information at the termination of her work for SBS and to not retain a copy of that information. I conclude that Ms. Schmidt substantially complied with her obligations with regard to the Protected Information, which obligations survived the expiration of the term of the Subcontractor Agreement. Following the cessation of her work for SBS, Ms. Schmidt returned all written documentation promptly to SBS and a copy of all of the electronic information she had for SBS clients.

The only failure of Ms. Schmidt to comply with her obligations regarding Protected Information was that she retained on her own computer an electronic copy of Protected Information she had developed during her working relationship with SBS. Ms. Schmidt claimed she needed these electronic files to prove the amount of her counterclaim and that she used this information solely for the

MEMORANDUM DECISION - 11

purpose of calculating the amount she was owed for work done from December 1, 2008 through February 9, 2009. She testified that she did not divulge the information to any third parties and there is no evidence that she did. Because she had access to that information, however, Ms. Schmidt was able to use the information in the seamless continuation of her services to the SBS Former Clients.

SBS seeks three remedies with regard to the Protected Information: (i) a return of all of such information that does not relate to the SBS Former Clients, (ii) compensation for Liberty's use of the Working Files of the SBS Former Clients, and (iii) damages for the loss of revenue related to the SBS Former Clients who switched to Liberty. I find that SBS is entitled to the return or destruction of all Protected Information in Ms. Schmidt's possession which pertains to any client other than one of the SBS Former Clients. I do not find, however, that SBS is entitled to any compensation or damages from Liberty or Ms. Schmidt for their use of SBS Working Files related to the SBS Former Clients.

Liberty and Ms. Schmidt avoided the expense of recreating the SBS Former Clients' electronic Working Files because Ms. Schmidt had retained a copy of those files on her computer and was able to utilize them when Liberty took over the billing for these clients. It is not clear how much labor in terms of file setup time Ms. Schmidt actually saved by having this information, nor is that relevant, because I conclude that the SBS Former Clients were the owners of the information in the Working Files and that SBS had an obligation to provide all of the information to the SBS Former Clients upon the termination of their contracts.

MEMORANDUM DECISION - 12

Exhibit P-38 contains the Billing Services Agreements between SBS and the SBS Former Clients. Paragraph 8 of the standard SBS agreement requires SBS, at termination of the agreement, to provide to the customer an itemized printout of all patient accounts with outstanding balances and a printed history of an individual patient's account for a period of three months. In addition, SBS is required to maintain the customer's electronic data base for a period of seven years and to give the customer the option to obtain a complete printout of all patient accounts. Thus, the SBS Former Clients had the right to demand nearly everything contained in SBS' Working Files at the termination of their contracts. Ms. Hatter testified that there was a difference between the SBS Working Files and the raw patient data and that in her judgment, former customers of SBS would not have had a right to any notes of conversations between the SBS biller (in the case of the SBS Former clients, Ms. Schmidt) and a patient or insurance representative, and other information collected by the biller. I fail to see how a proper patient account could be provided to these customers, however, without that information, and also find that it would be a very laborious task to separate all of the information.

I conclude that while Ms. Schmidt and Liberty may have saved some time in labor recreating the SBS Former Client Working Files, SBS saved the cost of having to provide to its former clients the patient records in those Working Files. The SBS Former Clients who testified at trial testified that Liberty used their patient files with their permission.

I further find that SBS is not entitled to any damages for loss of revenue due to the SBS Former Clients shifting their

MEMORANDUM DECISION - 13

business to Liberty.  In pretrial proceedings, I held that as of
February 2009, Ms. Schmidt was not subject to any noncompete
obligation.  Her solicitation of SBS customers was lawful.  There
is no evidence that any SBS Former Client switch to Liberty *because*
Liberty had access to their electronic patient files.  Rather, the
evidence proved that these customers switched to Liberty was
because of their personal relationship with Ms. Schmidt and their
high level of satisfaction with her work.

For the foregoing reasons, I find that Ms. Schmidt and Liberty
must return or delete all electronic Protected Information on their
computers related to any SBS customer other than the SBS Former
Clients.  All other SBS claims related to Protected Information are
denied.[5]

**B.  Defendants' Misappropriation of trade secrets within the meaning of RCW 19.108.010(2) and violation of the Uniform Trade Secrets Act, RCW 19.108.**

Plaintiff has the burden of proving that legally protected
secrets exist.  *Boeing Co. v. Sierracin Corp.*, 108 Wash. 2d 38, 49,
738 P.2d 665 (1987).  A customer list can be a protected trade
secret if it meets the criteria of the Trade Secrets Act.  *American
Credit Indem. Co. v. Sacks*, 213 Cal.App.3d 622, 262 Cal. Rptr. 92
(1989).  Trade secret protection will not generally attach to
customer lists, however, where the information is readily
ascertainable.  *Boeing*, *supra*.  "If information is readily
ascertainable from public sources such as trade directories or
phone books, then customer lists will not be considered a trade

_____

[5]  Because I find that Ms. Schmidt had a contractual duty with regard to Protected Information, I do not need to consider whether she also had a common law duty of loyalty as to that information.

MEMORANDUM DECISION - 14

secret and a prior employee, not subject to a noncompetition agreement, would be free to solicit business after leaving employment." *Ed Nowogroski Insurance, Inc. v. Rucker*, 137 Wash.2d 427, 441, 971 P.2d 936 (1999). In this case, all of SBS' clients were readily ascertainable from public records, and Ms. Schmidt put into evidence the public sources she used to send her solicitation letters. Moreover, because Ms. Schmidt and Liberty were not subject to a noncompete agreement, they were free to solicit former clients of SBS after Ms. Schmidt ended her relationship with SBS.

SBS also contended that its forms, such as its Billing Services Agreement (Exs. P-18, P-38), accounts receivable forms (P-20), billing services authorization form (Ex. P-23), facsimile cover sheet (Ex. P-24), patient registration form (Ex. P-26), insurance verification form (Ex. P-28), daysheets (Ex. P-30), and practitioner profile sheet (Ex. P-32) were all protected document forms within the Trade Secrets Act. I conclude that none of these forms is subject to trade secret protection. They are all forms that could easily be created by a person in the medical billing industry, some are merely excel spreadsheets, and most, if not all, originated with Lindsay Roark, Ms. Hatter's and Ms. Schmidt's former employer. Mr. Roark testified at trial that Ms. Schmidt and Liberty had their permission to use all forms which originated in their office and that this consent was memorialized in a writing dated December 2, 2009. Ex. D-18.

For the foregoing reasons, I find that defendants are not liable to plaintiff for misappropriation of trade secrets or violation of the Uniform Trade Secrets Act.

MEMORANDUM DECISION - 15

**C.    Common Law Conversion.**

Having found that Ms. Schmidt and Liberty are not liable to SBS under the Washington Trade Secrets Act, I conclude that they are not, for the same reasons, subject to any liability under a common law theory of conversion. *See also Nowogroski, supra* (Common law conversion preempted by trade secrets act).

**D.    Tortious interference with contractual relations and business expectations.**

SBS has asserted a claim that Liberty and Ms. Schmidt unlawfully interfered with its contractual relations. Liberty has asserted a similar claim against SBS. To prove a claim for tortious interference with contractual relationships and business expectations, the party asserting the claim has the burden of showing:

> (1)    The existence of a valid contractual relationship or business expectancy;
> (2)    The defendant's knowledge of and intentional interference with that relationship or expectancy;
> (3)    A breach or termination of that relationship or expectancy induced or caused by the interference;
> (4)    An improper purpose or the use of improper means by the defendant that caused the interference; and
> (5)    Resultant damage. *Eugster v. City of Spokane*, 121 Wn.App. 799 (2004).

Neither party submitted any evidence of an improper purpose on the part of the other that would support a cause of action for tortious interference with contractual relations, therefore, the Court finds against each of them on their respective claims.

**E.    Defendant Schmidt's claim for breach of contract.**

Ms. Schmidt has asserted a counterclaim for unpaid compensation relating to her billing work in January and February

MEMORANDUM DECISION – 16

2009 for SBS clients.  SBS counters that Ms. Schmidt was fully paid
for her work and that because she breached her agreement with SBS
by failing to complete billing activities for her SBS customers in
January and February, she is not entitled to any further
compensation.

The Subcontractor Agreement provides in paragraph 4 that
Ms. Schmidt was to receive two-thirds of the money *received* by SBS
from the customers whose accounts were handled by Ms. Schmidt plus
two-thirds of each patient setup fee which was received by SBS from
the same customers.  After the expiration of the Subcontractor
Agreement in 2000, the parties continued this compensation
arrangement.  The important aspect of this arrangement is that
Ms. Schmidt was not entitled to her commission until SBS clients
received payment from their patients and in turn paid the
commission on those receipts to SBS.

1.  Breach of Contract.

In order to determine whether Ms. Schmidt has a right to
additional compensation, a determination must be made as to whether
she breached her billing obligations to SBS clients.  There was
considerable debate at trial over whether Ms. Schmidt was
terminated by SBS or whether she quit.  Ms. Hatter gave an
unequivocal notice of termination to Ms. Schmidt on January 29,
2009, then followed up immediately with a very ambiguous letter
which offered to recall the notice of termination.  Ms. Schmidt,
uncharacteristically, ceased her billing activities for a one week
period between January 30 and February 6, giving Ms. Hatter the
impression that she had stopped her SBS work.  By the time
Ms. Schmidt resumed her billing activities on February 6, 7, and 8,

MEMORANDUM DECISION - 17

1  Ms. Hatter's concern had caused her to notify clients not to send

2  any more information to Ms. Schmidt, which effectively terminated

3  Ms. Schmidt's ability to continue her billing for these clients.

4  Ms. Schmidt then sealed the termination with her letter to her SBS

5  customers on February 10.

6      From the foregoing actions of the parties, I conclude that the

7  agreement between SBS and Ms. Schmidt was terminated by mutual

8  agreement on February 9, 2009.  Neither party handled the

9  termination well, so they are equally responsible for the

10 disruption in customer service that followed.

11      2.  Ms. Schmidt's Right to Compensation.

12      Ms. Hatter testified that when a billing specialist is

13 terminated, they are not entitled to any further payments for work

14 done prior to termination unless receipts come in from the

15 customers prior to the termination date.  Neither the language of

16 the expired Subcontractor Agreement nor the nine-year practice of

17 the parties, however, supports her assertion.  I conclude that

18 Ms. Schmidt had a right to be paid for the billing work she

19 completed.

20      There is no evidence that Ms. Schmidt failed to comply with

21 any of her duties in December 2008 and no evidence of any

22 disruption to SBS customers related to that work.  Therefore, I

23 conclude that she is entitled to the compensation due her for work

24 that month.  Ms. Schmidt prepared Exhibit D-69A showing the amounts

25 received by SBS from Ms. Schmidt's customers in January 2009.  She

26 testified that these receipts related solely to work she had done

27 prior to January.  Based upon her commission percentage, she

28 calculated that her compensation would have been $11,180.64.

MEMORANDUM DECISION - 18

1  Ms. Schmidt also prepared Exhibit D-74 to show that the payments

2  SBS made to her in January and February of 2009 (Ex. P-37), which

3  total $15,721.19, related solely to her work done in December 2008.

4  I conclude from this evidence that Ms. Schmidt has been fully paid

5  for her work performed prior to January 2009.[6]

6      What remains is to determine what, if anything, Ms. Schmidt is

7  owed for her work performed in January and the first part of

8  February 2009.  SBS contends that Ms. Schmidt should not receive

9  any compensation for January and February because she did not fully

10  perform her work and as a result, SBS was forced to write off

11  portions of the customers' bills because of the disruption caused

12  by Ms. Schmidt's termination.  Specifically, SBS contends that

13  Ms. Schmidt breached her obligations in January of 2009 by failing

14  to complete all of her billing responsibilities, to prepare her

15  January month end reports, and to timely return all records and

16  electronic information to SBS so that SBS could complete the work

17  for Ms. Schmidt's customers.

18      I find that Ms. Schmidt's termination was a mutual one and

19  that SBS is equally responsible for whatever disruption resulted.

20  I further find that Ms. Schmidt substantially complied with her

21  obligations in January.  She testified that she uploaded all of the

22  patient information she received and she promptly made electronic

23  data and hard copy records available to SBS after SBS' written

24  _____

25      [6]  Ms. Schmidt contends in her trial brief that she is owed
   $11,380 for December 2008.  She corrected that number, which is
26  shown in Ex. D-69, to $11,180.64, as shown in Ex. D-69A.  She did
   not dispute the payments to her shown in Ex. P-37, however, and
27  testified at trial that all of the payments shown in Ex. P-37
   related to work she had done in December, which proved that she had
28  not been paid for her *January* work.

MEMORANDUM DECISION - 19

demand was made on February 9, 2009. Although Ms. Hatter and
Ms. Huffman testified that the records were "a mess", when pressed
on cross examination, Mr. Hatter admitted that the records were
incomplete only as to five of Ms. Schmidt's 45 customers. Given
that these 45 customers represented 64% of SBS' total customers, it
is not surprising that the transition was a difficult one. In
fact, the smoothest of transitions, which this one was not, would
still have been difficult. Finally, Ms. Hatter's testimony made it
clear that she wrote off customer bills in order to retain goodwill
with those customers for her own business reasons. Her decision to
make those concessions does not permit her to avoid her legal
obligations to Ms. Schmidt. Accordingly, I find that Ms. Schmidt
is entitled to reasonable compensation for her billing work
performed in January and February.

Exhibit P-50 shows receipts and billings for SBS in February
and March 2009. Ms. Hatter testified that had she billed all of
the amounts due clients of Ms. Schmidt for that month, Ms. Schmidt
would have been entitled to compensation of $12,297.52. That
number would be consistent with Ms. Schmidt's average monthly
compensation in 2008 of approximately $12,000. Ms. Schmidt
contends that she should also be paid $3,000 for her one week of
work in February 2009. Balancing the relative fault of SBS and
Ms. Schmidt in the transition of clients, I conclude that
Ms. Schmidt is entitled to compensation of $10,000 for January and
February.

MEMORANDUM DECISION - 20

**F.  Ms. Schmidt's counterclaim for negligent infliction of emotional distress.**

Under Washington law, negligent infliction of emotional distress damages are not available for a breach of contract. *Gaglidari v. Denny's Restaurants*, 117 Wn. 2d 426, 815, P.2d 1362 (1991)(traditional common law doctrine provides that tort damages for emotional distress caused by breach of an employment contract are not recoverable). In addition, proof of negligent infliction of emotional distress requires the defendant to provide proof of objective symptomatology. *See In Kloepfel v. Bokor*, 149 Wash.2d 192, 193, 66 P.3d 630 (2003)(court held that "the objective symptomatology requirement" properly applies to the tort of negligent infliction of emotional distress).

Ms. Schmidt testified that the process of renegotiating her expired Subcontractor Agreement and circumstances surrounding what she considered to be her termination by SBS were emotionally upsetting to her and resulted in her gaining 40 pounds. She provided no expert or medical testimony of any objective symptomatology as required by *Kloepfel*, accordingly, her claim for emotional distress damages against SBS must fail.

**G.  Nondischarge.**

Having concluded that SBS is not entitled to any affirmative monetary relief from Ms. Schmidt or Liberty, there is no need to consider nondischargeability under Section 523(a)(6). The obligation of Ms. Schmidt to return to SBS all Protective Information in her possession or control (*i.e.* information in possession of Liberty) that does not pertain to the SBS Former Clients is nondischargeable.

MEMORANDUM DECISION - 21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the foregoing reasons, I will enter an order (i) requiring Ms. Schmidt and Liberty to return or destroy all Protected Information as described above which is not related to the SBS Former Clients and which remains on their computers or in their possession; (ii) finding in favor of Ms. Schmidt on her counterclaim for unpaid compensation in the amount of $10,000; and (iii) dismissing all other respective claims of the parties. Counsel for defendants is instructed to note an order and judgment consistent with this decision for presentation.

///END OF MEMORANDUM///

*Karen A. Overstreet*

**United States Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**